# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

BEDROCK FINANCIAL, INC., a California Corporation

       Plaintiff,

    v.

THE UNITED STATES OF AMERICA; and Does 1 through 50, inclusive,

       Defendants.

THE UNITED STATES OF AMERICA,

       Counterclaimant,

    v.

BEDROCK FINANCIAL, INC., a California Corporation,

       Counterlcaim Defendant.

                /

CASE NO. 1:10-cv-01055-MJS

ORDER GRANTING BEDROCK FINANCIAL, INC.'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

(ECF Nos. 70, 77 & 78)

I.    **PROCEDURAL BACKGROUND**

    This case arises from a dispute over priority of interests in property in Merced County California.

The case originated with an action filed May 3, 2010, by Bedrock Financial, Inc., a California Corporation ("Bedrock"), against the United States Internal Revenue Service ("IRS") in California Superior Court, Merced, case number CV001026.  Bedrock, holder of a deed of trust on the subject property, sought to be subrogated to an earlier mortgage on the same property so as to establish priority over a federal tax lien which attached after the mortgage but before Bedrock's deed of trust.  The United States ("U.S.") appeared in the action and removed it to this Court.  Subsequently, the IRS was dismissed, leaving the U.S. as the only defendant.  The government answered and filed a third party complaint against First American Title Insurance Company and a counter claim against Bedrock. Apparently as a result of issues relating to Bedrock's corporate status and the fact that First American Title Company is a separate corporate entity from the one initially named by the U.S., the pleadings ultimately were amended and two actions morphed into a single consolidated action captioned as above and reflecting a claim by Bedrock against the U.S. and U.S. claims against both First American entities (hereinafter at times referred to jointly as "First American") and Bedrock, all relating to priority of the IRS and Bedrock claims against the property.

All parties have consented to the jurisdiction of the United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636 (c)(1).

Bedrock and the U.S. have filed cross-motions for summary judgment which have been deemed submitted and are now before the undersigned for decision.  (ECF Nos. 70, 77 & 78.)

Bedrock seeks the Court's finding and declaration that $171,107 of its lien on the property should be given priority over the government's tax lien and it seeks to foreclose on its lien.

The U.S. seeks a declaration that the $38,369 balance (as of July 16, 2012) due on its federal tax lien maintains priority over the Bedrock lien.  It too seeks to foreclose on its lien.  (Other claims by the government for conversion and injunctive relief have been

1  dismissed.)

2      These competing claims arise out of the following series of facts and occurrences
3  which are not in dispute.

4  **II.    FACTS**

5      The essential and undisputed facts[1] in this case are outlined chronologically as
6  follows:

7      The property at issue is located in Atwater, Merced County California and identified
8  as APN 004-110-005.  In 2006, the property was owned by Jose and Irma Fuentes.  In that
9  year the Fuenteses borrowed $150,000 from R.K Lowe and secured repayment by giving
10  Lowe a first deed of trust on the property.  The deed of trust was recorded in Merced
11  County in August 2006.

12      In September 2005, the U.S. Secretary of the Treasury created a statutory lien on
13  all property owned by the Fuenteses to secure a tax (plus penalties and interest)
14  assessment of approximately $42, 021.

15      In July 2007, the U.S. recorded a Notice of Tax Lien against the Fuenteses in
16  Stanislaus County, California (not the county in which the subject property is located).

17      In October, 2007, the U.S. recorded its Notice of Tax Lien, then in the amount of
18  $42,458, against the Fuenteses in Merced County, California, the county in which the
19  subject property sits.

20      In July, 2007, the creditor on the Lowe deed of trust, who was then owed a balance
21  of $171,107, initiated foreclosure proceedings on the subject property.  The Fuenteses
22  sought refinancing from Bedrock.  At that time there were two recorded liens on the subject
23  property, the Lowe deed of trust and the above-referenced tax lien.  The property was
24  appraised at $427,000, i.e., $213,436 over and above both liens.

25      First American created a preliminary title report on the subject property in

26  _____

27      [1] Except as otherwise indicated, disputes as to the facts and objections to evidence submitted in
    support of allegedly undisputed facts are found not to be material to resolution of the competing claims
28  and motions and will not be resolved here.

connection with the proposed refinance.  First American's search in connection therewith identified the 2007 tax lien on the property, but inexplicably did not report that the tax lien applied to these debtors and this property or affirmatively disclose it on its title report. There is no evidence First American made the tax lien known to Bedrock.  Instead, its title insurance policy ensured Bedrock its deed of trust would be and was the first lien on the property.

Bedrock's files include a January 31, 2008 credit report reflecting a tax lien against the Fuenteses in Stanislaus, but not Merced, County.

The U.S. did not try to collect on its lien at the time of the refinance or later when Bedrock undertook to foreclose on its note and deed of trust on the property.  There is a dispute as to whether U.S. was given effective notice.

Notwithstanding the above referred-to credit report indicating the debtors had a tax lien, Bedrock denies that it had actual knowledge of the tax lien on the property at the time of the refinance.  Its principal maintains under oath that it would not have made a refinance loan had it known of the tax lien.  It did grant the Fuenteses a loan in the principal amount of $243,000, $171,107 of which was applied to pay off the Lowe note and deed of trust and the costs of the transaction.  The Bedrock loan and deed of trust on the property was recorded in Merced County in February 2008.

By June 2009, Bedrock had become aware of the tax lien and its record priority over the Bedrock refinancing deed of trust.  It sought relief under a title insurance policy it had purchased from First American.  First American advised Bedrock that Bedrock was first obligated to foreclose on the property.  Bedrock, guided by attorneys hired by First American, then initiated and completed nonjudicial foreclosure proceedings and became the owner of the property in October 2009.

As of May, 2010 the appraised value of the property had plummeted to $213,000.

According to the U.S., the account balance, plus accruals and less credits, on the

1  Fuenteses' tax liability was $38,369 as of July 16, 2012.[2]

2  **III.    THE COMPETING CLAIMS**

3          Referencing the title history alone, Bedrock's lien sits in secondary position to that
4  of the U.S. on this property.  Because of the intervening loss in property value, neither
5  party will be regain the positive financial position it held at the time of the Bedrock refinance
6  or would have had if the tax lien had been dealt with at the time of that refinance,
7  regardless of who prevails in this action.  Given uncertainty as to the actual current value
8  of the property and costs of sale, it is not clear what precise net loss Bedrock or the U.S.
9  would suffer if the other were found to have priority.  Nevertheless, under reasonable
10 assumptions, the relative loss amounts appear quite comparable.[3]

11         However, it appears clear that First American would be obligated to indemnify
12 Bedrock for any such loss.  That, the U.S. argues, is why First American is causing and
13 paying for this action to be pursued and why granting the relief sought by Bedrock would
14 simply reward First American for its failure to disclose the tax lien on the property to
15 Bedrock.

16         As noted, Bedrock initiated this action by seeking a judicial declaration that it was
17 entitled, under <u>Han v. United States</u>, 944 F.2d 526, 530 (9th Cir. 1991) to an equitable lien
18 enabling it to step into the shoes of the loan which existed before the Bedrock refinance
19 and before the tax lien.  It seeks to foreclose on the senior lien created thereby.

20         Conversely, the U.S. wants a declaration that its tax lien is senior to the Bedrock
21 lien, and it wants to foreclose on its lien.  The U.S. bases its claim on the argument that
22 that Bedrock and First American both had notice of the IRS lien and negligently failed to

23

24         [2]  As Bedrock notes, IRS officer Reynolds testified at the time of his deposition that the balance
   was approximately $28,000 plus accruals.  The evidence supplied by the U.S. supports the more precise
25 $38,369 figure.

26         [3] For example, if the property sold for $200,000 and costs of sale were about $10,000, Bedrock
   would suffer a net loss of about $19,000 if its lien were subordinate to that of IRS's; the loss to IRS would
27 be about the same if Bedrock were subrogated.  The U.S. argument that its lien would be wiped out if
   subordinated to Bedrock's is based on the mistaken, and since clarified, belief that Bedrock was seeking
28 priority as to the full amount of its $243,000 loan.  Bedrock has now made clear that it seeks subrogation
   only as to the  $171,107 it applied to pay off the note underlying the deed of trust that predated the IRS
   lien.

1  consider it and that granting Bedrock relief would result in an inappropriate windfall for First
2  American and prejudice the U.S.

3  **IV.   ANALYSIS**

4      **A.    Legal Standard for Summary Judgment**

5           Any party may move for summary judgment, and the Court shall grant summary
6  judgment if the movant shows that there is no genuine dispute as to any material fact and
7  the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation
8  marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).
9  Each party's position, whether it be that a fact is disputed or undisputed, must be
10  supported by (1) citing to particular parts of materials in the record, including but not limited
11  to depositions, documents, declarations, or discovery; or (2) showing that the materials
12  cited do not establish the presence or absence of a genuine dispute or that the opposing
13  party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)
14  (quotation marks omitted).  While the Court *may* consider other materials in the record not
15  cited to by the parties, it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San
16  Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

17           In resolving cross-motions for summary judgment, the Court must consider each
18  party's evidence.  Johnson v. Poway Unified School Dist., 658 F.3d 954, 960 (9th Cir.
19  2011).  Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he
20  must affirmatively demonstrate that no reasonable trier of fact could find other than for him.
21  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Defendants do not
22  bear the burden of proof at trial and in moving for summary judgment, they need only prove
23  an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Securities Litigation,
24  627 F.3d 376, 387 (9th Cir. 2010).

25           In judging the evidence at the summary judgment stage, the Court does not make
26  credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984
27  (quotation marks and citation omitted), and it must draw all inferences in the light most
28  favorable to the nonmoving party and determine whether a genuine issue of material fact

1  precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo

2  Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

3  **B.   Standard for Equitable Subrogation**

4      The Ninth Circuit case Han v. United States, 944 F. 2d 526 (9th Cir. 1991) provides

5  the framework for the analysis of the facts, law and equities in this case:

6      The Hans purchased a piece of property which their real estate agent knew, but the

7  Hans did not,  was encumbered by a federal tax lien.  When the IRS undertook to levy on

8  the property to satisfy the lien, the Hans filed suit seeking, among other relief, to be

9  equitably subrogated to the position of the lender whose loan had been superior to the IRS

10 liens but was paid off when the Hans purchased the property. If successful, the Hans

11 would recover, on IRS foreclosure on the property, the amount they paid into escrow when

12 they purchased the property and IRS would recoup the same amount as if the delinquent

13 taxpayer still owned the property.  Otherwise, the Hans would end up having to pay a

14 portion of the sellers' delinquent taxes.

15     The Ninth Circuit found that the Hans were entitled to be equitably subrogated to the

16 first lien holder position previously held by the lender the Hans paid in full.  Applying the

17 California Supreme Court test adopted in Caito v. United Californian Bank, 20 Cal. 3d. 694,

18 704 (1984) (quoting Grant v. de Otte, 122 Cal. App. 2d 724, 728 (1954), it declared

19 equitable subrogation to be appropriate where:

20     "(1) Payment [was] made by the subrogee to protect his own interest.  (2) The

21 subrogee [has] not . . . acted as a volunteer.  (3) The debt paid [was] one for which the

22 subrogee was not primarily liable.  (4) The entire debt [has] been paid.  (5) Subrogation

23 [would] not work any injustice to the rights of others."

24     The Han court, adopting language in Caito, 20 Cal. 3d. at 704, added that equitable

25 subrogation was a broad equitable remedy granted liberally in California, not only when all

26 five of the above factors were met, but whenever "one person, not acting as a mere

27 volunteer or intruder, pays a debt for which another is primarily liable, and which in equity

28 and good conscience should have been discharged by the latter."

1       The District Court in Han had found four of the five factors met, but denied equitable
2   subrogation on the ground that the Hans' real estate agent's actual notice of the IRS lien
3   at the time of the Hans purchase was imputed to the Hans.  It noted that under Smith v.
4   State Savings & Loan Association 175 Cal. App. 3d 1092, 1098 (Cal. Ct. App. 1985),
5   actual knowledge of the existing encumbrance defeated equitable subrogation.  The Ninth
6   Circuit reversed, holding that notice to the Hans' agent was imputed to the Hans as a
7   matter of law and, hence, by definition, constructive, not actual, and that all other criteria
8   for equitable subrogation were satisfied.  Specifically, it found that having decided to
9   purchase the property without actual knowledge of the IRS lien, the Hans paid off the
10  senior lien to establish and protect their own interests, not to meddle in the lender's
11  relations with the seller.  The Hans were not primarily liable on the sellers debt, the entire
12  debt was paid, and the IRS would not suffer any injustice if subrogation were granted but
13  instead would find itself in the same position as if the seller still owned the property.  The
14  Hans were innocent parties lacking actual knowledge of the tax lien and, like any home
15  buyer, reasonably reliant upon their real estate agent to advise them of any such claim
16  against the property.  There was no evidence the Hans themselves were delinquent in
17  failing to discover the IRS lien.

18      Applying the Han criteria, it is clear Bedrock had no liability in relationship to the
19  property or the taxpayers debt to IRS at the time it undertook to make the loan.  There is
20  no reason to suspect that Bedrock undertook to make the loan for any reason other than
21  it believed it was in its best business interest to do so.  Such a lender is not a volunteer.
22  (Smith, 175 Cal. App. 3d at 1099; Simon Newman Co., 206 Cal. at 146).  Bedrock paid off
23  the entire loan.  There is no reason to suspect Bedrock had any motivation to interfere in
24  the relationship between the IRS and the taxpayers.

25      Whether Bedrock had knowledge of the IRS lien and/or whether it was negligent in
26  failing to discover the IRS lien are issues not so easily resolved.

27          1.    Knowledge

28  Bedrock insists that those involved in authorizing the loan had no actual knowledge

8

1   of the IRS lien and never would have made the loan had they been aware of it.  These two
2   claims are not refuted from a factual standpoint, but the U.S. maintains that Bedrock, the
3   institution, had actual knowledge of the lien and owes its apparent failure to factor the lien
4   into its loan calculations to its own culpable negligence.

5          There being no evidence to the contrary, the Court concludes that those at Bedrock
6   involved in authorizing the refinance loan to the taxpayers had no actual knowledge of the
7   IRS lien and would not have made the loan if they had been aware of the lien.  Yet, it is
8   clear from Exhibit B to the Declaration of Pete Bednarek that at the time the refinance loan
9   was made, there was in Bedrock's files a credit report showing the existence of the tax
10  debtors' tax lien, albeit with reference to property in another county.  (Bednarek Decl. Ex.
11  B.)   As the U.S. notes, Bedrock has not ruled out the possibility that some Bedrock
12  employee, e.g., the one who received the credit report and placed it in the file, had
13  knowledge of the IRS lien. As such it appears Bedrock the corporation did have actual
14  knowledge of the IRS lien.  See, e.g., Bank of New York v. Fremont General Corp., 523
15  F.3d 902, 911 (9th 2008) (citing Meyer v. Glenmoor Homes, Inc., 54 Cal. Rptr. 786, 800-01
16  (Cal. Ct. App. 1966) ("Generally, the knowledge of a corporate officer within the scope of
17  his employment is the knowledge of the corporation"); W.R. Grace & Co., Inc. v. Western
18  U.S. Industries, Inc., 608 F.2d 1214 (9th Cir. 1979) ("a corporate principal is considered to
19  know what its agents discover concerning those matters in which the agents have power
20  to bind the principal").

21         In this Court's view, such knowledge, however, is not the type that renders equitable
22  relief inappropriate.  As noted in Caito, 20 Cal. 3d. at 704, equitable subrogation is a broad
23  and liberally granted remedy available not only when all listed criteria are met, but
24  whenever one, not acting as a mere volunteer or intruder, pays a debt for which another
25  is primarily liable and which in equity and good conscience should have been discharged
26  by the latter.  The party seeking equitable relief must not have acted with "culpable and
27  inexcusable neglect".  Simon Newman Co., 206 Cal. at 145.  This Court reads Simon and
28  the tenor of the other authorities to say that the type of notice that will defeat equitable

subrogation should be such as to suggest the person seeking relief knowingly or with something approaching gross recklessness disregarded information and seeks to capitalize on his own ignorance to the detriment of an innocent third party. The type of apparently innocent, albeit arguably negligent, oversight here is not that which, standing alone, should deprive Bedrock of equitable relief.

2. <u>Real Party</u>

The U.S. also argues that the real party seeking subrogation here is First American and that its actual knowledge of the loan forecloses the equitable relief requested.  As noted, First American did indeed discover the existence of the IRS lien on the property during its searches in connection with the Bedrock refinance and was aware of it at the time the loan was made.  It, apparently negligently, failed to report it to Bedrock.  This knowledge however is not imputable to Bedrock in a way that defeats equitable subrogation.  In the same way that the Hans' real estate agent's actual knowledge was not deemed to be actual knowledge to the Hans, First American's knowledge is not actual knowledge to Bedrock.  Like most lenders, Bedrock relied upon its title company to advise of claims on the property.  First American failed to fully advise Bedrock.

That, however, is not the end of the inquiry.  As noted, upon discovering the IRS lien, Bedrock sought indemnification under the title insurance policy issued by First American.  Apparently First American is obligated under its title insurance policy to provide Bedrock with a defense and indemnity against loss in this case.  As such, if equitable subrogation is denied, First American, not Bedrock, will suffer the financial loss; if equitable subrogation is granted, First American, not Bedrock, will benefit and do so at the expense of the U.S.  Moreover, First American is exercising control and direction of  Bedrock in this litigation. Bedrock, dormant except as necessary to pursue this action, not only is a disinterested party, but a reluctant one.  The U.S. argues that the unique relationship between the two is such as to make First American the real party in interest whose actual knowledge of the IRS lien, and negligence in failing to advise of it, should foreclose the equitable relief sought here.

1   Although, the Court views with considerable skepticism Bedrock's argument that
2   First American did not have actual knowledge of the tax lien and, to a lesser extent, the
3   assertion that first American  was not guilty of culpable conduct, those issues need not be
4   resolved here.  Controlling authority in this jurisdiction makes it clear not only that, as
5   noted, First American's knowledge is not imputable to Bedrock, but the relationship
6   between Bedrock and First American is not such as to defeat equitable subrogation.

7   The U.S. relies on a Seventh Circuit case to support its argument that equitable
8   relief should be denied under such facts as exist here.  In First Federal Savings Bank of
9   Wabash v. United States, 118 F.3d 532 (7th Cir. 1997), a negligent title insurer directed
10  and financed a legal effort to obtain equitable subrogation and was the party who would
11  bear the loss if relief were denied.  The court concluded that in such circumstances, similar
12  to those here, the relationship between the insurer and insured was sufficiently linked as
13  to be characterized as "collusive" and render equitable relief inappropriate.

14  The Ninth Circuit, applying what appears to be more liberal California law, is to the
15  contrary.  In Mort v. United States, 86 F.3d 890 (9th Cir. 1996), as here, a title insurance
16  company overlooked an IRS lien and provided title insurance on a deed of trust to secure
17  a subsequent refinance loan on the property.  The insurer funded the insured's suit for
18  equitable subrogation.  The IRS urged denial of equitable relief because the insurer who
19  caused the loss was the one directing the litigation and IRS would suffer injustice if
20  subrogation were allowed.  It cited to other cases denying such relief where the insurer was
21  itself pursuing the litigation in its own name.  It distinguished Mort and similar cases from
22  those where the insured pursued the claim and suggested that nothing short of collusion
23  between the insurer and insured would lead to a different result. As Bedrock notes, In re
24  Tiffany, BAP Nos. NC-06-1256-SKuB, NC-06-1287-SKuB, 2007 WL 7541013, 11 (B.A.P.
25  9th Cir. Aug. 24, 2007), held that instigation and control of the litigation by the insurer is not
26  the sort of "collusion" as would defeat relief.  Collusion requires an agreement to defraud
27  or obtain a result contrary to law.  Here, as in In re Tiffany, the parties seek only to enforce
28  their contractual rights and obligations and obtain an equitable remedy authorized by law.

1            3.     Injustice

2        Equitable subrogation is designed to leave the junior encumbrancer in the same

3 junior position.  In re Tiffany, 342 F.App'x. 303, 305 (9th Cir. 2009).  This Court also finds

4 that, as in Mort, no injustice will result if equitable subrogation is a granted. IRS will be in

5 the same relative secured position it would have been in if Bedrock had not made the

6 refinance loan.  Katsivalis v.Serrano Reconveyance Co., 70 Cal. App. 3d. 200, 214-215

7 (Cal. Ct. App. 1977).  The contrary is not true; if equitable subrogation is denied, the IRS

8 will indeed have a windfall in that part of its lien will effectively be paid by Bedrock.

9                    **B.**    **Conclusion**

10        For these reasons Bedrock's motion for summary judgement will be granted and

11 that of the U.S. denied.  To the extent of its payoff of the $171,701 Fuentes' loan, Bedrock

12 shall be subrogated to the position held by the Fuenteses before the IRS lien attached.

13 Bedrock has a $171,106.85 equitable lien on the lot described as APN 004-110-005

14 Atwater, Merced County, California.  That lien shall have priority over the IRS lien on the

15 property.  Bedrock is entitled to foreclose judicially on its superior lien.

16        Bedrock is ORDERED to file and serve, on or before November 22, 2012, points

17 and authorities supporting its claim, if it does so claim, that it is entitled to any additional

18 specific order or intervention from this Court to effectuate this judgment, setting forth the

19 precise nature of the relief sought and the basis therefor, and including a proposed order

20 intended to accomplish same.  The U.S shall have until November 29, 2012 to file

21 opposing points and authorities and to submit an alternative form of proposed order. No

22 reply shall be filed.

23 **V.**    **ORDER**

24        The Court hereby ORDERS as follows:

25        1.     Bedrock Financial, Inc.'s motion for summary judgment (ECF No. 70 & 78)

26                 is GRANTED;

27        2.     The United States of America's motion for summary judgment (ECF No. 77)

28                 is DENIED;

3.     Bedrock Financial, Inc. has an equitable lien on the property in Atwater, Merced County California and identified as APN 004-110-005 in the amount of $171,106.85;

4.     Bedrock Financial, Inc.'s lien has priority over the IRS's lien on the property in Atwater, Merced County California and identified as APN 004-110-005;

5.     Bedrock Financial, Inc. is entitled to foreclose judicially on its superior lien, and

6.     Further briefing on the issues discussed in the final paragraph of this Order shall be filed by Bedrock Financial, Inc., on or before November 22, 2012, with opposition, if any,  by the United States of America to be filed no later than November 29, 2012.

IT IS SO ORDERED.

Dated:    November 11, 2012      /s/ *Michael J. Seng*

                                  UNITED STATES MAGISTRATE JUDGE