UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEDROCK FINANCIAL, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA; and DOES 1 through 50, inclusive,<br><br>Defendant and Third-Party Plaintiff,<br><br>v.<br><br>FIRST AMERICAN TITLE COMPANY and FIRST AMERICAN TITLE INSURANCE COMPANY, California corporations,<br><br>Third-Party Defendants. | CASE NO. 1:10-cv-01055-MJS<br><br>ORDER GRANTING MOTION TO DISMISS THIRD AMENDED THIRD-PARTY COMPLAINT, IN PART, AND DENYING MOTION TO DISMISS THIRD AMENDED THIRD-PARTY COMPLAINT, IN PART<br><br>(Doc. 110) |

On January 22, 2013, Third-Party Defendants First American Title Company and First American Title Insurance Company (collectively referred to as "First American") moved to dismiss the third amended third-party complaint.  Following briefing and objections, the Court vacated the motion hearing calendared April 12, 2013, and took the matter under submission.  The Court now grants the motion in part and denies it in part.

I.   **Factual Allegations and Procedural History**

According to the Third Amended Third-Party Complaint ("Complaint") (Doc. 107),

1

Jose M. Fuentes and Irma Fuentes (the "Taxpayers") owned property which is the subject of claims in this litigation and located in Atwater, Merced County, California. The property was subject to a Deed of Trust recorded in Merced County in August 2006 and dated August 12, 1997, in favor of R.K. Lowe, Trustee of the RK Lowe Revocable Trust. The Taxpayers have been delinquent on their 2004 federal income taxes since 2005.

A tax lien against the Taxpayers' property arose in September 2005, following the Government's assessment, notice, and demand for payment of Taxpayers' 2004 federal income taxes and Taxpayers' failure to pay. On October 24, 2007, the Government recorded a Notice of Tax Lien against Taxpayers in Merced County in the amount of $42,458.12 plus statutory accruals on their 2004 federal income taxes. Thereafter, the tax lien attached to the subject property and was second in priority to the RK Lowe Deed of Trust but senior to all other obligations on the subject property.

In 2008, Taxpayers secured a $243,000.00 loan to refinance the subject property from the First-Party Plaintiff Bedrock Financial ("Bedrock"). The subject property then had a fair market value of $427,000.00. Third-Party Defendant First American Title Insurance Company acted as escrow agent and issued a lender's policy of title insurance for the transaction. Escrow instructions directed First American to close the escrow to leave Bedrock with a first priority lien. Of the $243,000 refinance loan, First American disbursed $171,106.85 to pay off the principal and interest due on the loan secured by the RK Lowe Deed of Trust. First American disbursed the balance of the loan to others.

Before closing escrow, First American had identified the existence of the tax lien. Nonetheless, First American closed the escrow on February 5, 2008, without requesting a pay-off amount from the Government or paying off the tax lien. Had this Court not later granted Bedrock's action for equitable subrogation, Bedrock's deed of trust would have taken second priority after the tax lien.

On May 3, 2010, Bedrock filled suit against the Internal Revenue Service in

Merced County Superior Court for equitable subrogation, declaratory relief giving it first priority over the tax lien, and foreclosure of the Deed of Trust. (Doc. 1.) The Government removed the matter to this Court on June 8, 2010. (Doc. 1.) On November 13, 2012, this Court granted Bedrock's motion for summary judgment, granting it equitable subrogation and an equitable lien in the amount of $171,106.85. (Docs. 99 and 107.)

By late 2012, when Bedrock listed the subject property for sale, its fair market value had declined to no more than $175,000.00. As of July 16, 2012, the pay-off amount of the tax lien was $38,369.48. Following payment to Bedrock of its equitable lien and the costs of sale, the Government expects to collect nothing from the foreclosure sale proceeds on account of the tax lien.

## II.   Standard of Review

To survive a motion to dismiss for failure to state a claim (F.R.Civ.P. 12(b)(6)), a plaintiff must allege sufficient facts to state a claim that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A motion to dismiss for failure to state a claim should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle him to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), *citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Palmer v. Roosevelt Lake Log Owners Ass'n*, 651 F.2d 1289, 1294 (9th Cir. 1981). In analyzing the complaint, the Court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.), *cert. denied*, 454 U.S. 1031 (1981).

First American requests that, in applying this standard, the Court take judicial notice of the Declaration of Jim Weeks (Doc. 71) and the Declaration of Matthew D. Owdom (Doc. 73), both of which were submitted in support of the summary judgment motion brought by Bedrock. It does not articulate the specific purposes for which the Court should notice these declarations.

Pursuant to Fed.R.Evid. 201(b)(2), a court may take judicial notice of an adjudicative fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  An adjudicative fact of which a court may take notice is a fact of the type to which the law is applied in the process of adjudication.  *Grason Elec. Co. v. Sacramento Municipal Utility Dist.*, 571 F.Supp. 1504, 1521 (E.D. Cal. 1983).  In ruling on a motion to dismiss under F.R.Civ.P. 12(b)(6), as we must do here, a court may properly consider the allegations contained in the pleadings, exhibits attached to the complaint, if any, and matters properly subject to judicial notice.  *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).  Matters subject to reasonable dispute are not properly subject to judicial notice: a court's considering them in a motion to dismiss would convert it to a summary judgment motion.  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 n. 9 (9th Cir. 2012).

For American Title to prevail in its motion to dismiss, it must prove that the Government fails beyond doubt to prove any set of facts consistent with the third amended third-party complaint that would entitle it to relief.  *United States v. Olsen*, 2001 WL 1519686 at *3 (N.D.Ill. Oct. 15, 2001) (No. 98 C 2170).

In his declaration, Jim Weeks, a vice-president and senior underwriter of First American, set forth facts that he contended established that First American did not intend to omit the Government's tax lien or impair its security interest.  Because Weeks's opinions are both legal conclusions and facts subject to reasonable dispute, judicial notice of his declaration is not appropriate.

The declaration of Matthew Owdom, attorney for Bedrock and First American, was provided to introduce evidence in support of Bedrock's motion for summary judgment and included copies of the amended complaint and counterclaim, excerpts of depositions conducted in this matter, documents secured in the course of the discovery, and the parties' stipulations.  The Court may take judicial notice of any fact set forth in this declaration and its exhibits so long as the fact is one not subject to material dispute

4

and derived from an unquestionably reliable source.

### III. Conversion

Conversion is the wrongful exercise of dominion over personal property of another. *Steele v. Marsicano*, 102 Cal. 666, 669 (1894). The elements of a cause of action for conversion are (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of the plaintiff's property rights, and (3) damages. *Baldwin v. Marina City Properties, Inc.*, 79 Cal.App.3d 393, 410 (1978).

The Government alleges that by distributing the proceeds of the refinance loan to others, American Title converted funds subject to the tax lien. American Title counters that the facts alleged in the third amended complaint establish none of the elements since (1) the Government did not own the property at the time of the alleged conversion; (2) American Title did not intentionally impair the Government's security; and (3) the tax lien was not valueless after American Title disbursed the escrowed funds.

Whenever the government asserts a tax lien under 26 U.S.C. § 6321, the threshold question "is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach." *Aquilino v. United States*, 363 U.S. 509, 512 (1960). The Government contends that the Taxpayers had property, or rights to property, in the proceeds of the refinance loan. Because Section 6321 "creates no property rights but merely attaches consequences, federally defined, to rights created under state law," California state law governs the determination of the Taxpayers' property rights to the funds. *See United States v. Bess*, 357 U.S. 51, 55 (1958).

A federal tax lien arises when unpaid taxes are assessed. 26 U.S.C. § 6322.[1] The lien attaches to all of the delinquent taxpayer's real and personal property and

---

[1] Evaluating tax-related conversion cases requires an understanding of the distinction between tax liens and tax levies. A tax lien (*see* 26 U.S.C. § 6322) attaches to all after-acquired property; a tax levy (*see* 26 U.S.C. § 6332) is effective only on property existing on the date of the levy. *See Nomellini Const. Co. v. United States*, 328 F.Supp. 1281, 1287 n. 15 (E.D.Cal.1971).

5

remains attached until either the tax is paid or the lien becomes unenforceable due to a lapse of time. *See* 26 U.S.C. § 6322; *United States v. Donahue Industries, Inc.*, 905 F.2d 1325, 1330 (9th Cir. 1990). An assessment of unpaid taxes arises against a taxpayer and encumbers all of the taxpayer's real and personal property, except that specifically exempted by law, from the time the assessment is made until the tax is paid or the assessment becomes legally unenforceable. 26 U.S.C. § 6321. It also attaches to after-acquired property. *Bensinger v. Davidson*, 147 F.Supp. 240, 245 (S.D. Cal. 1956). If a taxpayer has property or property rights in monies to be disbursed by an escrow agent such as a title company, the tax lien attaches to those monies. *United States v. Allen*, 207 F.Supp. 545, 546 (E.D.Wash.1962). "[A]fter a transaction involving property encumbered by a tax lien, '[t]he lien reattaches to the thing *and to whatever is substituted for it*.'" *United States v. Henshaw*, 388 F.3d 738, 742 (10th Cir. 2004), *quoting Phelps v. United States*, 421 U.S. 330, 334 (1975).

Similarly, when a taxpayer had a contractual right to the cash value of insurance under the terms of his policy contract with the insurer, which amount the taxpayer could borrow against, assign, or pledge, the taxpayer had property or rights to property. *Bess*, 357 U.S. at 56. In this case, under the provisions of the refinance note, the Taxpayers had a contractual right to funds equal to the principal of the note secured by the deed of trust to Bedrock ($243,000.00). American Title disbursed the refinance proceeds on behalf of the Taxpayers.

"[O]nce the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's property or rights to property." *Aquilino*, 363 U.S. at 513 (*internal quotation omitted*). A federal tax lien attaches to any advance of funds to a taxpayer. *Nomellini*, 328 F.Supp. at 1287. "Once in the hands of the taxpayer . . . . the money became property enveloped with the government's liens." *Id.* That American Title acted as the Taxpayers' agent to disburse the proceeds of the refinance loan did not alter the Taxpayers' ownership of those funds.

6

"[A] third party possessing property or rights to property belonging to a taxpayer holds such property subject to the lien, unless the third party has a prior lien or comes within one of the exceptions listed in 26 U.S.C. § 6323." *United States v. Bank of Celina*, 721 F.2d 163, 166 (6th Cir. 1983).  For example, when a federal tax lien had been filed and the builder's escrow agent had knowledge of the tax lien, the escrow agent improperly converted the tax debtor's funds by advancing the proceeds of a construction loan for payment of nonlienable obligations.  *Allen*, 207 F.Supp. at 549-50.

Neither party disputes that the amounts due to RK Lowe ($171,106.85) to redeem Taxpayer's deed of trust had first priority or that the tax lien, in an initial principal amount of $42,458.12, had second priority.  Accordingly, the tax lien attached to the proceeds of the Bedrock loan and American Title should have paid the tax lien from the balance of the proceeds following the RK Lowe pay-off, a total of $71,893.15, before it paid the Taxpayer's lower priority creditors, their non-secured creditors, or the Taxpayers themselves.

Nonetheless, American Title disbursed the remaining balance to pay various expenses incident to Bedrock's loan to the Taxpayers, then disbursed the remaining balance to the Taxpayers but, despite its title searcher's having identified the prior tax lien, made no payment to the Government.  Because American Title misapplied funds to which the tax lien had attached, the third amended third-party complaint states a claim for conversion.

"A knowing and intentional turn-over to a third person of monies subject to federal tax liens, contrary with the United States' demand for enforcement of its liens, and to the detriment of the tax lien, is a conversion of property, which will support a common law tort action for conversion of that tax lien." *United States v. Drexler*, 1987 WL 28602 (E.D.Okla. March 17, 1987) (No. 86-112-C).

> The intention required is an intention merely to exercise a dominion or control over the chattel which in fact seriously interferes with the right of another to control it.  It is not an intention to interfere with the rights of another; and the defendant may be liable for conversion where he has in fact exercised dominion or control, although he may be quite unaware of

> the existence of the rights with which he interferes.  Thus he may be a converter when he dispossesses another of a chattel in the entirely reasonable belief that it is his own, or where he innocently buys stolen goods.
>
> Restatement 2d Torts § 224(c).

*See also Nottingham, Ltd. v. United States*, 741 F.Supp. 1447, 1449 (C.D.Cal.1990) ("The foundation for the action of conversion . . . rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which the injury to the latter results"); *Northeast Bank of Lewiston and Auburn v. Murphy*, 512 A.2d 344, 347 (Me.1986).

If an escrow agent disbursed funds to pay nonlienable debts instead of paying off a federal tax lien, the escrow agent is liable to the government up to the amount of the payments wrongfully made to others.  *Allen*, 207 F.Supp. at 547, 550.  *See also Olsen*, 2001 WL 1519686 at *3 (denying motion to dismiss where the government alleged that the escrow agents had converted funds subject to tax lien when disbursing the proceeds of a refinance loan).  For example, where the government's tax lien had priority over a bank's lien on a taxpayer's accounts receivable, the bank wrongfully converted funds by collecting amounts received by the taxpayer and applying them to pay off the bank loan.  *Walker v. United States*, 636 F.Supp. 61, 63 (N.D.Okla.1986).  *See also Henshaw*, 388 F.3d at 743 (holding that common law remedies, such as those for conversion, supplement § 6332, particularly when a third party has dissipated funds on which the government would otherwise have levied).  *But see Fritschler, Pellino, Schank & Rosen, S.C. v. United States*, 716 F.Supp. 1157, 1160-61 (E.D.Wis.1988) (holding that in the case of a tax *levy*, § 6332 was an exclusive remedy and that the government could not pursue a conversion action).  That American Title overlooked the tax lien despite its discovery by a title searcher does not obviate its liability.  "Good faith or a mistake of law or fact are not defenses in an action for conversion."  *United States v. North Side Deposit Bank*, 569 F.Supp. 948, 957 (W.D.Pa. 1983).

In *Nomellini*, 328 F.Supp. at 1285, this Court rejected the plaintiff's motion that it

quiet title to certain personal property by disregarding the government's conversion claim and ruling that the government's sole remedy was statutory. Among other actions, Nomellini had attempted to satisfy debts due to it from the taxpayer by seizing the taxpayer's machinery and equipment. Nomellini characterized the seizure as a purchase but had taken no steps to establish title to the property. It simply claimed the property and abandoned it in storage.

The Court found that the government's conversion claim was based not on Nomellini's refusal to surrender the equipment to the government's levy but on Nomellini's subsequent conduct, which resulted in the equipment's having become worthless:

> The statutory and common law remedies redress different evils. The manifest purpose of § 6332 is to force the physical surrender of levied property to permit administrative sale, while the common law remedy casts a wider net to provide relief for any tortuous act which impairs the lienor's interest in the converted property.

*Id.*

Despite acknowledging possible deficiencies in the government's procedure, the Court declared, "Having knowledge of the government's claims, however, [Nomellini] had no right to ignore them, dissipate the entire security, and thus render the claims valueless." *Id.* at 1286. Even if Nomellini believed that the levy was unlawful, said the Court, a prudent person would have preserved the security and sought release of the tax levy: "[T]hose like Nomellini who choose to 'shoot first and ask questions later' must pay for their errors." *Id.* Here, American Title failed to preserve the cash proceeds of the refinance loan, disbursing funds subject to the tax lien to multiple unsecured payees, as well as to the Taxpayers themselves.

American Title contends that its actions were not tortuous, arguing that when it dissipated the funds subject to the tax lien, adequate equity remained in the Taxpayers' real property. It relies solely on an unpublished District Court case. *United States v. Smyers*, 1998 WL 681461 at *9 (C.D.Cal. August 24, 1998) (No. CV 98-2603 MMM(MCX)). In *Smyers,* the judge cited *Nomellini* for the proposition that "[t]o sustain a

claim for tortuous conversion of property encumbered by a tax lien, the government must prove that the defendant engaged in conduct that rendered the government's lien valueless." The *Smyers* dicta does not support American Title's contention.

Before 1994, Smyers owned real property leased to the taxpayer, Special Cutting Tools, Inc. ("SCT"). SCT owed the government accrued payroll taxes for tax periods from December 1991 through June 1993; the government assessed liability against SCT from March 1992 through June 1993. In August 1993, SCT abandoned its leasehold, leaving behind various tools and equipment, all of which were encumbered by tax liens filed against SCT. Pursuant to California Civil Code §§ 1980 *et seq.*, Smyers seized the abandoned machinery and equipment, and directed their sale. Prior to the February 15, 1994 auction, the auctioneer provided the IRS with notice of the sale and a detailed description of the property to be sold. The IRS took no action to assert any rights to the property and did not attend the sale. After costs of sale, storage and environmental clean-up expenses, and related fees, Smyers netted $21,869.60. In April 1994, the IRS attempted to levy on the net sale proceeds; Smyers refused to honor the levy, arguing that he no longer possessed SCT's property.

The court concluded that Smyers was not liable for tortuous conversion of the property. It distinguished Smyers's actions from those in *United States v. Paladin* (539 F.Supp. 100 (W.D.N.Y.1982)), which concerned a fraudulent conveyance intended to circumvent a tax lien, and *Nomellini*, in which the junior creditor took possession of the encumbered property, commingled it with his own property, then permitted all of the property to deteriorate:

> In the present case, Smyers did not wrongfully exercise dominion over the government's property in the same manner the defendants did in *Nomellini* and *Paladin*. Rather, he invoked the procedures prescribed by statute for removal and disposition of property left unclaimed on the leased premises and notified the United States of the sale prior to its occurrence. The mere sale of encumbered property, the effect of which makes it more difficult for the government to attach such property, does not by itself constitute conversion.

1998 WL 681461 at *9.

The *Smyers* judge erred in relying on *Nomellini* for the proposition that a conversion claim will be cognizable only if the defendant's conduct rendered the government's lien valueless. The reference to Nomellini's rendering the liens valueless appears in the court's analysis of Nomellini's contention that the Internal Revenue Code foreclosed common law remedies and limited the government's redress to forcing third parties to surrender levied property:

> At one time, the Internal Revenue Service was powerless to force the surrender of a delinquent taxpayer's property in the hands of third persons, who could thus refuse to relinquish the property and thereby frustrate a tax sale. United States v. Metropolitan Life Ins. Co., 130 F.2d 149 (2d Cir. 1942). To remedy this obvious oversight, Congress enacted the predecessor of § 6332, requiring the surrender of levied property on demand and enforcing the newly created right with a penalty equal to the value of the property. Since the statutory penalty enforced a new right, therefore, it was arguably intended to be the exclusive means of recovering damages for failure to surrender the equipment. *In this case, however, the conversion action rests not upon Nomellini's refusal to relinquish the equipment after demand, but upon his subsequent conduct rendering the government's liens valueless*. Under these circumstances, § 6332 was certainly never intended to foreclose the government from its common law remedies.

328 F.Supp. at 1285 (*added emphasis denotes language quoted by American Title*).

This language certainly does not impose an unequivocal requirement that for the government to bring a conversion action, the property subject to the lien must have become valueless. The next paragraph makes clear that the court did not intend to impose such a requirement:

> The statutory and common law remedies redress different evils. The manifest purpose of § 6332 is to force the physical surrender of levied property to permit administrative sale, while the common law remedy casts a wider net to provide relief for any tortuous act which impairs the lienor's interest in the converted property. With one exception, therefore, one remedy does not necessarily include the other.

328 F.Supp. at 1285-86.

What is the single exception?

> When the allegedly converting act is a single demand and refusal, the two remedies overlap. In this case, ***and only in this case***, does the difficult question arise of whether the statutory remedy is exclusive. As I have pointed out, the government here does not rest its claim upon demand and refusal.

11

328 F.Supp. at 1286 n. 11 (*emphasis added*).

Addressing American Title's dissipation of cash subject to the tax *lien*, the Government's conversion claim against American Title does not involve demand and refusal of a tax *levy* either. The *Smyers* decision simply does not require the Government to demonstrate that American Title's disregard of the tax *lien* rendered it valueless.

In *Nomellini*, the Court also addressed a $10,000.00 cash advance that had been paid to Nomellini and the taxpayer jointly. *Id.* at 1287-88. Noting that Nomellini had itself named as a joint payee to obtain partial payment of the taxpayer's indebtness to it and that Nomellini was aware of the government's asserted interest in the taxpayer's property, the Court described Nomellini's insistence that the cash fund was not the taxpayer's property as "little more than a scheme to circumvent the government's claims." *Id.* at 1287. Finding "no compelling reason to treat the impairment of lien rights in money any more leniently than the impairment of the same rights in equipment, which is not so easily hidden," the Court imposed on Nomellini personal liability for the full amount of the converted funds. *Id.* at 1288. In a footnote, it added:

> [T]he negotiability of money creates unique problems which may call for relaxed rules. Section 6323 of the Code, however, creates a priority even against filed tax liens for those who take encumbered money without knowledge of the lien. This section, therefore, provides adequate protection for those who innocently impair the government's lien rights. Since Nomellini knew of the government's asserted interest, it cannot invoke this protection.

328 F.Supp. at 1288 n. 17.

Because American Title is not asserting ownership or a superior lien on the balance of the loan proceeds, *Nomellini* is factually distinguishable. Nonetheless, two of the principles articulated in *Nomellini* are relevant here. First, having knowledge of the tax lien by virtue of its title search, American Title erred in dissipating the balance of the refinance funds. Second, having so erred, American Title, not the American taxpayers, should pay. The Government has alleged a cognizable claim of conversion.

12

## IV. Waste

The Government alleges that First American "possessed the Tax-Debtors' refinance loan proceeds, in which the United States had an ownership interest by virtue of the Federal Tax Lien, and committed bad-faith waste by distributing those proceeds to other parties in disregard of the United States' interest." Doc. 107, ¶ 41 at 5. First American counters that since waste can only apply to physical damage to real property by a person in possession, the Government does not state a cognizable claim for waste.

"[W]aste is conduct on the part of the person in possession of property that substantially impairs a security interest in the property." *Fait v. New Faze Development, Inc.*, 207 Cal.App.4th 284, 295 (2012). "[W]aste is, functionally, a part of the law which keeps in balance the conflicting desires of persons having interests in the same land." *Cornelison v. Kornbluth*, 15 Cal.3d 590, 598 (1975), *quoting* 5 Powell on Real Property § 636 at 5-6 (1974) (*internal quotation marks omitted*).

When the common law action for waste arose in 12th century England, it served to protect owners of succeeding estates of inheritance from property damage caused by the wrongful conduct of the person then in possession. *Cornelison*, 15 Cal.3d at 598. By 1850, the cause of action had evolved to protect concurrent holders of interest in land from the wrongful conduct of possessors. *Id.*, *citing Van Pelt v. McGraw*, 4 N.Y. 110 (1850). In *Van Pelt*, the New York court explained:

> [T]his action is not based upon the assumption that the [mortgagee's] land has been injured, but that his mortgage as a security has been impaired. His damages, therefore, would be limited to the amount of injury to the mortgage, however great the injury to the land might be.

4 N.Y. at 112.

Although in modern times, waste protects a mortgagee's security interest from the mortgagor's acts, it also extends to harm committed by third parties not in possession of the property that impairs the security interest. *Cornelison*, 15 Cal.3d at 598 n. 3 ("It is equally clear that a mortgagee's security interest can be impaired by harm to the property committed by third persons not in possession and that a mortgagee can

13

recover damages in tort for such impairment of his security interest."). Recovery against such third parties involves different rules and considerations because the tortfeasor is not a debtor or mortgagor which is entitled to certain legal protections, including California's antideficiency statute. *Id.* at 598 n. 3, 605. Thus, American Title's reliance on an incomplete quote from *Fait* (207 Cal.App.4th at 291 n. 2) is misplaced.

In *Cornelison*, the court did not resolve the question of whether a third-party tortfeasor could be subject to liability for "bad faith waste," defined as reckless or malicious despoliation of the property.[2] 15 Cal.3d at 603-04, 606. In such a case, a mortgagee or holder of a deed of trust would be entitled to recover damages "in the amount of the impairment of the security, that is the amount by which the value of the security is less than the outstanding indebtedness and is thereby rendered inadequate." *Id.* at 606. In this sense, an action for waste impairing the lienholder's security differs from "true waste recovery," such as that of a landlord against a tenant. 1 Mortgages, Deeds of Trust, and Foreclosure Litigation § 4.51 (2012).

When the wrongdoer is the mortgagor or trustor, the mortgagee or trustee must first seek to recover any diminution in the value of its security through foreclosure of the property itself. *U.S. Financial v. Sullivan*, 37 Cal.App.3d 5, 16 (1974). "When a third party damages the property," however, "both the mortgagor and the mortgagee may sue the third party tortfeasor." *Id.* at 17, *quoting American Savings and Loan Ass'n v. Leeds*, 68 Cal.2d 611, 614 n. 2 (1968).[3]

The majority of waste cases address the loss of value of a secured interest resulting from actual physical damage to the underlying real property. For example, in

---

[2] Because of the provisions of antideficiency statutes, whether waste is "bad faith waste" is a relevant consideration when the borrower itself is alleged to have damaged the property's value. *See Fait*, 207 Cal.App.4th at 289. In *Cornelison*, the California Supreme Court defined bad faith waste as waste resulting from the bad faith acts of the trustor-debtor, not diminutions in the property's value resulting from the economic pressures of a market downturn. *See D.A.N. Joint Venture v. Binafard*, 116 Fed.Appx. 93, 94 n. 3 (9th Cir.2004).

[3] In this case, because the "tortfeasor," American Title, brought (financed) the underlying action on behalf of the mortgagee, Bedrock, Bedrock did not assert a contract claim against American Title for compensation under the terms of its title insurance. Potential conflict of interest issues arising from such an arrangement are not before the Cofurt.

14

*U.S. Financial*, a construction lender sought recovery against third parties whose negligent filling of lots in the subdivision that U.S. Financial financed had caused differential settlement that damaged the new homes and diminished their value to an amount less that the principal of the loan. 37 Cal.App.3d at 9-10.  In *Cornelison*, the trustors defaulted on the deed of trust by selling the single family home subject to the deed of trust without paying the balance due on the promissory note.  15 Cal.3d at 594.  After the property was sold two more times, the board of health condemned the property as unfit for human habitation.  *Id.*  The trustee foreclosed, then pursued a third party, Kornbluth (the second purchaser), for waste arising from his failing to properly care for the property such that the improvements to the property were lost.  *Id.  See also American Savings and Loan Ass'n*, 68 Cal.2d at 612 (both purchasers and trustee of deed of trust were damaged when home sellers concealed and camouflaged defects in home that resulted from improperly filled and compacted soil); *Duarte v. Lake Gregory Land and Water Company*, 39 Cal.App.3d 101, 103 (1974) (value of property diminished by mud slide resulting from third-party's negligence).  But American Title's position that physical harm to real property is always necessary to prosecute a waste claim goes too far.

California courts have not limited recovery under a theory of tortuous waste only to situations involving physical harm to real property.  In *Nippon Credit Bank, Ltd. v. 1333 North California Blvd.*, 86 Cal.App.4th 486, 496 (2001), the First District Court of Appeal recognized that nonpayment of property taxes could be just as damaging to a lender's security interest as intentional destruction of the property.  It found that a borrower's failure to pay property taxes was akin to a life tenant's desire to cut immature timber when harvest would appropriately occur after the tenant's lifetime.  *Id.* at 497.  In the court's opinion, any action that diminished the lender's security interest in favor of the borrower's financial gain was impermissible "milking" of the property.  *Id.*  The decisive test in determining whether a borrower should be liable for such economic waste is whether the lender "suffered losses caused by actions the borrower would not

have taken had it been fully liable." *Id.* at 498, *quoting* Stein, *The Scope of the Borrower's Liability in a Nonrecourse Real Estate Loan*, 55 Wash. & Lee L.Rev. 1207, 1244 (1998) (*internal quotation marks omitted*).

Neither the Taxpayers nor Bedrock would voluntarily have left the federal tax lien unpaid if they believed that they would ultimately be held liable for it.  Indeed, American Title's failure to disburse the amount due to discharge the tax lien contravened both the generally accepted practice of paying off a federal tax lien when closing a real estate transaction and Bedrock's explicit direction to First American that it was to have a first priority lien when the transaction was complete.  (Of course, Bedrock is shielded from the economic result of American Title's failure to pay off the federal tax lien both by its title insurance policy and by the Court's earlier determination that it was equitably subrogated to RW Lowe's position as first-priority lender.)

In another California case in which waste occurred in the absence of physical damage to real property, the Second District Court of Appeal addressed the contention of financial waste by a vendor who held a note for the bulk of the defendant's purchase of land and contended that the defendants had substantially impaired its security interest by failing to apply subsequent construction loan proceeds to enhance the land's value. *Miller v. Citizens Savings & Loan Ass'n*, 248 Cal.App.2d 655, 665 (1967).  The court rejected the vendor's contention, noting that the terms of its subordination agreement did not include loan proceeds that were not applied to improving the land and that, since the additional encumbrance was subordinate to the plaintiff's lien, the vendor's security was not impaired. *Id.*

Since the Court has already determined that Bedrock was entitled to equitable subrogation of its loan, entitling its lien to priority above the tax lien, priority of claim does not save the day for the Government in this case as it did for Miller.  Accordingly, the Court must look to the actions of the third party, American Title, which disbursed the proceeds of the refinance loan to the Taxpayers and to various unsecured creditors whose claims would have been junior to the tax lien.  That disbursement constituted

waste of the loan proceeds. The Government's claim that American Title's disbursement of the refinance loan proceeds to third parties with lower priority claims and to the Taxpayers themselves constitutes tortuous waste is cognizable and should proceed.

## V.      Intentional or Negligent Impairment of Security

The Government contends that First American intentionally or negligently closed escrow and distributed the loan proceeds to others, impairing the Government's security interest in the subject property and causing the Government to lose the full amount of its lien. First American counters that because adequate security for the lien remained following the Bedrock refinance, the Government's security was not impaired.

"A holder of a security interest may maintain an action for the impairment of a security by a third-party tort-feasor." *Baldwin*, 79 Cal.App.3d at 403. "The liability of the wrongdoer for an impairment of a security interest is not limited to intentional actions and includes acts of negligence where it is reasonably foreseeable that such negligence would result in the impairment of the security interest." *Id.* at 403. To maintain an action for damages for impairment of a security interest, a plaintiff must allege facts sufficient to establish that their security interest has been impaired. Id. at 404.

The Court's research has uncovered no precedential basis for treating negligent or intentional impairment of security interest as a separate tort, however. Case law treats the tort of impairment of a security interest as tantamount to conversion or waste. For example, although a federal district court acknowledged that a third party's seizing and selling property subject to an existing IRS lien may intentionally impair the IRS's security interest in the property, it analyzed a landlord's intentional impairment of the IRS's security interest in property owned by the tax debtor and former tenant as tortious conversion, that is, wrongful exercise of dominion over property belonging to another. *Smyers*, 1998 WL 681461 at *8, *quoting* 4 B. Witkin, Summary of California Law, Torts, § 610. In multiple cases, California state courts have conflated waste with conduct on the part of a person in possession of property that substantially impairs a security

interest.  See also *Cornelison*, 15 Cal.3d at 604; *Fait*, 207 Cal.App.4th at 295; *Nippon Credit Bank*, 86 Cal.App.4th at 493.  In the absence of case law recognizing impairment of security as a separate tort, this Court declines to find that the third amended complaint states a claim for impairment of security independent of the claims for conversion and waste.

## VI.    **Conclusion and Order**

Because the third amended third-party complaint states cognizable claims of conversion and waste, which should be allowed to proceed, this Court DENIES First American's motion to dismiss those claims.  Because the third amended third-party complaint does not state claims of negligent and intentional impairment of security separate from its claims of waste and conversion, the Court GRANTS First American's motion and ORDERS that the claims of negligent and intentional impairment of security be dismissed.

IT IS SO ORDERED.

Dated:    May 21, 2013                          /s/ *Michael J. Seng*
                                                UNITED STATES MAGISTRATE JUDGE